No. 29,024.

OSCAR MYERS, *Appellee*, v. THE ANTI-AUTOMOBILE THIEF ASSOCIA-TION, *Defendant*, and THE CONTINENTAL LIFE INSURANCE COMPANY, *Appellant*.

(283 Pac. 503.)

Opinion filed January 11, 1930.

*James A. McDermott* and *Richard B. McDermott,* both of Winfield, for the appellant.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *Wm. E. Cunningham,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on an oral contract of insurance claimed to have been made by plaintiff, Oscar Myers, with the defendant, the Continental Life Insurance Company. Plaintiff prevailed, and the insurance company appeals.

The Anti-Automobile Thief Association inaugurated a campaign for members. To promote the campaign it desired to give to new members who requested it a travel-accident insurance policy of the dollar-a-year type. To enable it to do this the A. A. T. A. entered into a contract with the Continental Life Insurance Company, dated November 1, 1925, the material portions of which read as follows:

."Whereas, party of the first part is desirous of securing certain travel-accident policies for distribution among its patrons and clients; and whereas, party of the second part is engaged in the business of insurance and is duly qualified by its charter and is licensed to write the kind of insurance desired;

"Now, therefore, in consideration of the mutual covenants, obligations and considerations hereinafter set forth, the said parties hereto agree as follows:

"COMPANY AGREES:

"1. To issue its certain travel-accident policies to all of those patrons and clients of the distributor, whose name and other information concerning said

patron and client is written upon applications to be furnished by the company for that purpose. Such applications to be mailed to J. N. Becker, 216 Shukert building, Kansas City, Mo., who is hereby named registrar of the company. He will issue policies according to applications on the day said applications are received by him at his office in Kansas City, Mo. Policy to be known hereafter as Patrons Accident Policy, Form N. Pa 323-25, a copy of which is hereto attached, and its provisions and conditions shall at all times determine the liability of the company to all patrons and clients.

. . . . . . . . . . . . . . .

"DISTRIBUTOR AGREES:

"1. To mail all applications to registrar of the company, who will issue policies and advise the distributor of date of issue, which shall be conclusive evidence of the perfecting of such insurance upon such person whose name appears on the application. . . .

"2. Said distributor agrees to pay J. N. Becker one dollar and seven cents ($1.07) for each such policy, said sum to be paid in full with each application and in full payment of all premiums or assessments on said policies.

. . . . . . . . . . . . . . .

"It is further understood and agreed that distributor is not by this agreement constituted an agent of the company nor of the corporation, and is not authorized to make any agreement binding upon the corporation or upon the distributor, or to in any manner make any contract or waive any of the conditions or agreements in said insurance policy."

The kind of policy which the company proposed to issue was one providing specified indemnity for loss of life, limb, sight, or time, by accidental means, in very limited classes of cases. It contained schedules of liberal indemnity for the restricted losses specified. In all other respects the policy was in the form and contained provisions common to accident insurance policies. The contract between the insurance company and the A. A. T. A. continued in force for one year.

H. W. Berry was a solicitor of the A. A. T. A. to secure members. The method of doing business was described by the president of the A. A. T. A. as follows:

"These agents approached automobile owners or prospects for what is known as membership in the association, and solicited them along the line of selling of service in case of theft of their cars, explained to them about the markings on a car, and then they sold the man a membership. He would give them an official receipt for the amount which he collected, and remit that part which was due the company to the company.

. . . . . . . . . . . . . . .

"Q. Now, during the month of August, 1926, did your agents, in addition to selling an automobile protection, also sell accident or life insurance policies of any kind, to your knowledge? . . . A. No, we had nothing of

that kind to sell. We had an agreement with the Continental Life Insurance Company for the furnishing of . . . a dollar accident policy to members of our association where the applicant for membership made request for same. We did not sell these policies, but gave them with the regular membership fee, and unless the applicant made request for the same, a requisition was not made on the Continental Life Insurance Company for a policy. However, if we did receive a request for a policy with the application for membership in the A. A. T. A., we then forwarded the name of the party with one dollar to the Continental Life Insurance Company, for a policy which was supposed to be sent by them to the applicant.

"Q. What was the rate per year for the A. A. T. A. insurance? A. $12.50."

Berry solicited Oscar Myers to become a member of the A. A. T. A. and take a policy. Myers testified to what occurred:

"About the 12th or 14th of August, 1926, Mr. Berry and Mr. Crow came out to my place one evening. I hadn't seen him for quite a while. He says, Oscar, I am protecting the farmers now. I am writing car-theft-association insurance, and also sick and accident policy with it. I asked him what he asked for it. He says, $15 a year; he says it protects your car and stuff, and a sick and accident policy. He says, you can't afford to do without it, said it will help you out. He said it would draw $10 a week if I got hurt in any way, shape or form—doctor bill, hospital bill, one thing and another. I asked him and Crow to stay for supper. Finally I took it out. I gave him a check for $8 that night. I told him I didn't have the money, so he said pay part of it, and I will wait for the rest. I think I paid $8 that night, and the next month when I got my money where I was working, I gave him another check for $7. The first thing I told him, I says, Harry, when will I get my policy? He says, you will get the policy in about ten days, this policy will come from St. Louis, Mo. He said, you will be protected, he says, from the time you give me this check. He says, I will give you a receipt. I says, all right. I never did get my policy, but he got his money. He said ten dollars a week when I wasn't able to do nothing—I mean if I got hurt, or anything, for thirty weeks, the doctor bill and hospital bill. . . . I was to draw if I was blind or got my feet cut off, or my arms cut off, fifteen hundred dollars if I got one eye put out, one arm off, or one leg off. He said I couldn't do without the policy. . . . He said that it was the Continental Life Insurance Company of St. Louis was the company he was representing. He stuck up cards around the place, and stamped my car all over.

"Q. Did he do anything else? A. That is all, just stamped the car, put up notices, A. A. T. A., or something like that. I later paid him seven dollars after I got my money. I never got a policy from the Continental Life Insurance Company. . . .

"Q. When this fellow Berry was there, did he give you any paper or anything of the kind to sign when he took the money? A. He just gave me that card. It was about so long (indicating); he gave me a receipt.

"Q. Did he have you sign any paper or anything of that kind? A. No, I didn't; I never signed no paper."

One fault in the solicitation was, Berry was authorized to charge $12.50 for an A. A. T. A. membership, and not $15. To make the official receipt provided by the A. A. T. A. correspond with the amount Berry charged Myers, Berry struck out $12.50 and inserted $15, so that the receipt read as follows:

(This is to be given to the member.)

OFFICIAL RECEIPT                    No. 9033.

THE ANTI-AUTOMOBILE THIEF ASSOCIATION OF AMERICA.

Phone 8484.

TOPEKA, KAN., Aug. 16, 1926.

Received of Oscar Myers the sum of............................dollars for one year's membership in the A. A. T. A. of A. Make of car, Ford. Type of car, touring.

Commencing Aug. 16, 1926, ending August 14, 1927.

Cars $15.00 ($12.50)* per year.

Buildings, $35.00 per year.

THE ANTI-AUTOMOBILE THIEF ASSOCIATION OF AMERICA.

Per H. W. BERRY.

The back of the receipt bore printed matter, the emblem of the A. A. T. A., and the prices of membership for cars and buildings. The price for cars on the back of the receipt was not changed.

A. O. Crow, who was with Berry when Berry solicited Myers, told what occurred. His testimony relating to the indemnities Myers would receive in case of accident was similar to the testimony of Myers. Crow testified further as follows:

"Q. Did he have any papers or documents of any kind there with him that you saw he carried with him? A. He had a—some kind of life insurance policy, about that big, square and long. Some kind of a Continental Life Insurance paper. He was reading a lot of this from the policy.

"Q. A policy? A. I don't know whether it was a policy. He read it off of that paper. I didn't pay no attention to what he was getting it from.

"Q. Wasn't the paper something like that? A. Yes, that looks like the very one he had. He read it off of that paper; I don't know whether it was that paper or not, but it looked like that. He had some literature around the car, all about the Anti-Automobile Thief Association; he had tags he put on barns and houses, and tags to put on cars, numbers and everything to mark them with.

"Q. Receipt books? A. Yes, he had two or three receipt books. I would say one of them had the picture of the Anti-Automobile Thief Association on them, then the other didn't have anything on. He gave Myers two receipts, one printed with red ink something like that which had the picture on the back. : . . The other receipt he tore out of a little book about that long.

---

* Canceled figures.

It was white paper. There was a little printing at the top, and he wrote the rest himself. I didn't notice what was printed.

. . . . . . . . . . . . . . .

"Berry had a policy with him that looked like that one, and in my judgment it was the same kind of a policy. Whatever he told them he read from the face of the policy.

. . . . . . . . . . . . . . .

"Q. He had this there before Myers when he was talking? A. He was in the car, and Oscar was setting on the running board when he had that out. He was right there present.

"Q. Of course, you wouldn't tell the jury that while he sat there talking to Myers he read over all that was in this policy, do you? A. No, there was a lot of it that he never did read that I know of.

"Q. What he did say to him he read from that instrument there, didn't he? A. I don't know whether he read from that or not; he was looking at it, reading to him."

Witnesses Allison, Alsip and Warren testified that Berry solicited them to join the A. A. T. A. and take insurance policies. Each one testified he was shown a sample insurance policy. Each one testified the price was $12.50, but Allison testified he paid only $11.50. There was no evidence that Myers or the insurance company had any information regarding these transactions.

As indicated, Myers signed no application or other paper, and there was no evidence that the insurance company ever heard of him or of Berry's transaction with him, or received any of his money, or received any application or money from the A. A. T. A. for a policy to be issued to him.

In a letter to one of Myers' attorneys, written before suit was commenced, Becker, the company's general agent, said:

"The Anti-Automobile Thief Association of Topeka, Kansas, purchased a travel and pedestrian accident policy from us for each of their new subscribers. Their solicitors were licensed as representatives of the Continental, but they, however, only sold these policies as a part of the service of the A. A. T. A."

The president of the A. A. T. A. testified that Berry sent in a good many applications for membership in the association, with requests for policies. The requests were forwarded to the insurance company, and so far as the witness knew, the policies were issued in due time. Berry became in arrears in his accounts, and at the time of the trial was not connected with the association.

The petition merely stated that for a consideration of $15 the company orally agreed to insure Myers against loss of life, limb, sight, or time, occasioned through sickness or accidental means;

that in case of accident defendant agreed to pay certain sums if certain results followed; that plaintiff had an accident, which was described, and that certain results followed. The prayer was for $5,910, for injury to eyesight, doctors' bills, hospital bills, and a weekly indemnity from date of accident to time of trial.

The insurance company demurred to plaintiff's evidence, and the demurrer was overruled. The insurance company introduced no evidence and the court gave an instruction to the jury relating to apparent authority and apparent scope of authority of an agent. The giving of the instruction is assigned as error. The instruction afforded the jury no information respecting what apparent authority and what apparent scope of authority mean, and gave the jury no criteria by which to determine whether Berry had express or implied or apparent authority to make an oral contract of insurance of any kind. The insurance company, however, goes to the heart of the matter by contending the demurrer to the evidence should have been sustained, and in the opinion of the court, determination of that question will decide the case.

Inquiry at the insurance department reveals that Berry never was licensed as an agent of the insurance company. The fact being one determinable by public record not contestable, the court might treat it as if admitted by the parties. (R. S. 60-3316 as interpreted in *Hess v. Conway*, 93 Kan. 246, at page 251, 144 Pac. 205.) The fact, however, will be ignored. The terms of the licenses referred to in Becker's letter were not shown, and the fact that Berry was licensed proved nothing regarding the nature and extent of his authority. There was no evidence Myers knew anything about the license, and it could not have generated any belief in his mind regarding Berry's power.

There was no evidence that Berry had any express authority to make contracts of insurance on behalf of the company, much less oral contracts of insurance, or to collect premiums. The utmost that can be said is that he had authority to take from Myers an application for a policy of insurance of the kind the company was issuing, on a form furnished by the company to the A. A. T. A. for use in connection with soliciting membership in the A. A. T. A. The question reduces, therefore, to whether Berry had apparent authority to make the oral contract of insurance pleaded.

In order to be bound the principal must. be responsible for the appearance of authority which the agent manifests. The principal

must permit the appearance knowingly, or under such circumstances that he should know of its manifestation. In this instance there is no evidence in the record that the insurance company knew what Berry was actually doing, knew even that applications which Berry took and which the A. A. T. A. sent in, came from him; and there is no evidence that the company should have known Berry was pursuing a course of misrepresentation regarding his power.

While the insurance company contracted to furnish applications to the A. A. T. A., all that Berry had with him traceable to the company was a receipt book and a sample policy. There was in fact no evidence that he really had a receipt book. Crow called the white paper book a receipt book, but Myers did not tell of anything that Berry receipted for, or tell anything about what Berry wrote on the white paper. The paper itself disappeared, although the insurance feature of the transaction was regarded as an important if not the most important part of it.

The insurance policy which Berry had with him was used as a sample policy would be used in soliciting insurance. Berry made no pretense that he could write a policy, or issue a policy, or deliver an issued policy. Myers was to get the policy in about ten days, from St. Louis. In order that the policy might be sent to Myers the company would of necessity have to be informed. As indicated, Myers signed no paper, and there was no evidence that any memorandum was made of terms which the policy should contain.

The receipt for money which Myers paid was not the receipt of the insurance company. It was the receipt of the A. A. T. A., and specified on its face that it was for one year's membership in the A. A. T. A., at a rate or price of $15 per year for a Ford touring car.

It will be recalled that Berry went to Myers' house in the evening, stayed for supper, and Myers gave his check that night. There was no evidence that Myers was forbidden to read or was prevented from reading the sample policy which Berry displayed and read from.

In the case of *Townsend v. Railway Co.*, 88 Kan. 260, 128 Pac. 389, the syllabus reads:

"1. An act of an agent which is within the apparent but not within the real scope of his authority is binding upon the principal where otherwise loss would result to one who has in good faith relied upon such appearance.

"2. An act is within the apparent scope of an agent's authority when a reasonably prudent person, having knowledge of the nature and usages of the business, is justified in supposing that he is authorized to perform it, from the character of the duties which are known to be intrusted to him."

Under the circumstances which have been stated, what was a reasonably prudent man entitled to believe respecting Berry's power? There is but one answer to this question. Myers negotiated for a policy of insurance; but he was put on guard that it would be a policy of insurance Berry could not write, could not issue when written, and could not deliver when issued. Myers dealt with Berry as an agent having limited authority respecting the very thing negotiated for, and Myers had no ground for believing that he and Berry could orally agree on terms of insurance of their own invention, or on terms of insurance of their own picking and choosing from a form of policy before them, and bind the insurance company by the agreement.

There is no need to palter about the fact that Berry produced a policy of the company before Myers, and pretended to read from it. Part of what he read appeared in the form of policy attached to the contract between the insurance company and the A. A. T. A. Other portions were misread, and none of the qualifying restrictions and limitations were read. If Myers was deceived respecting the terms of the policy from which Berry read, it was his own fault.

There is no doubt that Myers expected to receive a policy of insurance of the kind Berry displayed, portions of which would be as Berry represented. The suit, however, is not on a contract of insurance corresponding to an application for a policy, and is not on a contract of insurance corresponding to any kind of policy which the company put out. The suit is on a freak oral contract, creating strange liabilities, and containing none of the reasonable conditions or limitations which are common to accident insurance policies, and which are essential to sound insurance as a matter of public policy. Berry had no authority, or apparent authority, to conclude, then and there, such a contract on behalf of the company.

In the case of *Nichols v. Casualty Co.*, 113 Kan. 484, 214 Pac. 1111, plaintiff signed an application for accident insurance which was correctly prepared, and a policy was issued in accordance with the application. In soliciting the insurance the soliciting agent represented that the policy which would be issued would insure against any kind of accident, and against sickness. The company

did not write policies of that character, and the policy which it issued indemnified against loss occasioned by injuries of specified classes only. Plaintiff suffered an injury not covered by the policy, and recovered in the district court. The judgment was affirmed here. So far as the decision tends to sanction power of a soliciting agent to bind the company by an oral contract of insurance, it is disapproved.

The judgment of the district court is reversed, and the cause is remanded with direction to sustain the demurrer to plaintiff's evidence.

JOCHEMS, J., not participating.